IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

DARRYL MCCRARY,

     Defendant.

CRIMINAL ACTION NO.

1:20-cr-306-TWT-CMS

## FINAL REPORT & RECOMMENDATION

On September 22, 2021, a federal grand jury sitting in the Northern District of Georgia returned a fifteen-count Second Superseding Indictment against nine defendants, including Defendant Darryl McCrary, who is charged in two counts. [Doc. 154].  The Second Superseding Indictment charges McCrary in Count One with being part of a conspiracy to distribute heroin, fentanyl, cocaine, and marijuana [*id.* at 1–3], and in Count Three with possession with intent to distribute cocaine on July 27, 2020 [*id.* at 4].[1]

---

[1] This case was originally brought against McCrary's codefendant, Antonio Daniels, by a Criminal Complaint dated July 28, 2020 [Doc. 1] and later by an Indictment returned on August 11, 2020 [Doc. 16].  Six months later, McCrary and four others were added as defendants in a First Superseding Indictment.  [Doc. 53]. As noted above, the Second Superseding Indictment was returned on September 22, 2021, and is now the operative charging document.  [Doc. 154].

On April 1, 2022, McCrary filed a preliminary motion to suppress, challenging the legality of a stop and search of his vehicle that occurred on the date of his arrest—July 27, 2020.  [Doc. 269].  Following an evidentiary hearing, McCrary filed a post-hearing brief, clarifying his arguments.  [Doc. 367].  McCrary now argues that the stop of his vehicle and the subsequent search violated the Fourth Amendment to the United States Constitution.  He asks that the Court suppress all evidence obtained from the stop as well as evidence considered to be fruit of the poisonous tree.[2]  [Docs. 367, 386].  In response, the Government argues that there was probable cause to believe that contraband or evidence of a crime would be found in the vehicle based on evidence obtained in a months-long DEA investigation, making both the stop and search of McCrary's vehicle lawful under the automobile exception to the Fourth Amendment's warrant requirement.  Alternatively, the Government argues that the stop was legal because law enforcement had, at a minimum, reasonable suspicion to conduct an investigatory stop pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968), and that the subsequent search of the vehicle was

---

[2] In particular, McCrary seeks to suppress cell phone evidence obtained pursuant to a warrant issued on August 7, 2022.  He argues that the affidavit included facts about evidence recovered from what he characterizes as the illegal search of his vehicle.  [Doc. 367 at 18].

supported by probable cause based on a canine officer's alert to his vehicle.[3]  [Doc. 384].

## I.   Facts Developed at the Evidentiary Hearing

On January 20, 2023, I held an evidentiary hearing, and a transcript was prepared.  [Doc. 359, Transcript ("Tr.")].  Four witnesses provided live testimony: Drug Enforcement Administration ("DEA") Task Force Officer David Noe [Tr. at 6–74]; DeKalb County Police Department Detective Maltheus Tillman [Tr. at 74–149]; Detective Ronnie Viar, Jr. [Tr. at 149–161]; and Officer Curtis Jones [Tr. at 161–167].  Additionally, the Government provided evidence from Officer Noe via two search warrant affidavits that were admitted into evidence.  [Doc. 371-8 (Gov. Ex. 7, "Whitehall St. Aff."); Doc. 371-10 (Gov. Ex. 9, "Phone Aff.")].

### A.  **Evidence that McCrary was involved in drug trafficking activities**

Task Force Officer Noe averred that beginning in October 2019, the DEA was investigating a large drug trafficking organization operating in the Atlanta, Georgia area, as well as in Texas and Mexico.  The investigation had led to the seizure of thirteen kilograms of cocaine, $690,000, and a drug/money ledger accounting for

---

[3] The Government also makes a third argument, i.e., that the stop was legal because law enforcement had probable cause to believe that McCrary was speeding at the time he was pulled over.  Because I agree with the Government about its first two arguments, I have not addressed the speeding issue here.

thousands of kilograms of cocaine coming into the Atlanta area between January 2017 and September 2019.  [Whitehall St. Aff. ¶ 14].  According to Officer Noe, the ledger showed that McCrary's codefendant, Antonio Daniels, was one of the largest customers in the Atlanta area, having received more than 1,000 kilograms of cocaine during that time.  [*Id.* ¶¶ 14, 17].

Officer Noe further averred that the investigators had obtained multiple federal wiretap orders, authorizing wire and electronic interceptions over several phones used by Daniels between March and July 2020.  [Whitehall St. Aff. ¶ 23; Tr. at 12].  The wiretaps showed, with at least two of those phones, Daniels communicated with a person that law enforcement referred to as "UM168" about drug transactions.  [Tr. at 13–14].  As explained below, agents later concluded that McCrary was UM168.

At the hearing, the Government introduced line sheets from the wiretaps showing communications between Daniels's phones and phones associated with UM168.  [Docs. 371-1 through 371-7 (Gov. Exs. 1–6)].  According to Officer Noe, as soon as agents began their wiretap investigation in March 2020, they intercepted communications about drug trafficking between Daniels and UM168, and during the course of the DEA's investigation into Daniels, agents intercepted several phone

calls and text messages between Daniels and UM168 discussing drug transactions. [Tr. at 13–15; Doc. 371-1 (Gov. Ex. 1)].

### *March 31, 2020*

For example, on March 31, 2020, Daniels called UM168 trying to meet up to grab a "little boy." [Tr. at 16; Doc. 371-1]. Officer Noe testified that heroin is commonly referred to as "boy" and that he believed UM168 and Daniels were discussing distributing heroin. [Tr. at 16]. Later that day, Daniels told UM168 to pick up nine bags of "mixes." [Tr. at 17; Doc. 371-2 (Gov. Ex. 2); Phone Aff. ¶ 19a]. Daniels provided UM168 with instructions on how to get into the location where the "mixes" could be found, advising that the bags would be labeled with a marker with the word "mix," and another would say "100." [Doc. 371-2]. Daniels then explained that the drugs would be in a crate in the "back-back." [*Id.*]. In response to Daniels's instruction, UM168 replied that he would "put it in." [*Id.*]. Officer Noe testified that, based on his training and experience, he believed Daniels had asked UM168 to bring nine units of drugs that were labeled in marker with the word "mix" and some with the word "100" in a crate in the back of the location. [Tr. at 17; Phone Aff. ¶ 19a].

*May 24–25, 2020*

Additionally, Officer Noe testified about another series of recorded conversations between Daniels and UM168 that occurred in late May 2020, and a meeting agents observed between Daniels and the person they believed to be UM168. [Tr. at 18–24]. On May 24, 2020, intercepted communications showed that Daniels had purchased a telephone for UM168 to use to talk with Daniels about drug business. [Whitehall St. Aff ¶ 55]. The following day, on May 25, 2020, Daniels and UM168 discussed a drug deal:

> DANIELS: 1 mattress is for you, I'm not saleing [sic] anyone else a clean new mattress.
>
> UM168: Lol ok
>
> DANIELS: Where to
>
> UM168: Apartment close to you
>
> DANIELS: Okay
>
> UM168: On the way
>
> DANIELS: Cool

[Doc. 371-4 (Gov. Ex. 4); Doc. 371-5 (Gov. Ex. 4a); Tr. at 18]. Officer Noe testified that based on information the agents had gathered during the investigation and based on his prior training and experience, he believed UM168 and Daniels were going to

6

exchange drugs, specifically clean, uncut cocaine.[4]  [Tr. at 21–22; Whitehall St. Aff. ¶ 56].  Later that day, they discussed the location, which agents believed was the Creekside Corners apartment complex in Lithonia, Georgia, where agents were conducting surveillance.  The wiretaps recorded UM168 advising Daniels that he had arrived and asking if the gate was open.  [Whitehall St. Aff. ¶¶ 57–58; Tr. at 21, 22; Docs. 371-5 (Gov. Ex. 4a) at 7, 8].  Daniels replied that he was coming outside. [Tr. at 65–67; Doc. 371-5 at 7].

At the time of these communications, agents observed a man believed to be UM168 pull into the parking lot driving a beige Cadillac Escalade.  [Whitehall St. Aff. ¶ 59; Tr. at 23].  Agents then observed Daniels walk from the breezeway of the building and get into the beige Cadillac, noting that Daniels had a cell phone box in his pocket.  [Tr. at 22–23; Whitehall St. Aff. ¶ 59].  This was consistent with other communications that agents had intercepted the day before indicating that Daniels had obtained a new phone for UM168.  [Tr. at 19–20; Phone Aff. ¶¶ 20, 20a].  Fifteen minutes later, Daniels got out of the Cadillac carrying a large shoe bag, but without the cellphone box in his pocket; he walked back toward the breezeway.  [Tr. at 67;

---

[4] Officer Noe further confirmed that there was no indication that the men were actually engaged in buying furniture, bedding, or mattresses, which supported Officer Noe's belief that UM168 and Daniels were communicating in code to discuss drugs.  [Tr. at 22].

Whitehall St. Aff. ¶ 59].  Based on his own personal observations, Officer Noe made an in-court identification of McCrary as the driver of the Cadillac.  [Tr. at 23–24, 66–67].

After observing this interaction, Officer Noe contacted DeKalb County Police Department Detective Ronnie Viar and asked for assistance identifying the driver of the beige Cadillac and for information about the Creekside Corners apartment complex.  [Tr. at 24].  Based on the license tag, the agents determined that the Cadillac was registered to an address in Riverdale, Henry County, Georgia.  [Tr. at 24].

### July 13–14, 2020

On July 13, 2020, agents intercepted another phone call between UM168 and Daniels during which the following exchange occurred:

> DANIELS: The people went up 3,000, but I told everyone it had gone up 5. I'm charging people 45. They would not get anything if they did not have 45.
>
> UM168: Damn.
>
> DANIELS: From the price we had been at, you have to give back 33. I had wondered why we had not had any for two weeks. He said they had not wanted to buy them. They had tried waiting the people out, thinking that the price would go down. That was going up. He said it had only gone up 1,000 the first week. I told him we would have only had to have paid 1,000. That shit was crazy.

UM168: Yeah

DANIELS: You need to get your count and let me know what your counts are, so I can take care of you right away.

UM168: Yeah

DANIELS: Or we could do half of it on the first 30, and then get the other half out of the other half.

UM168: Yeah, I will just have to do a recount and calculate the extra in there.

DANIELS: Just let me know. I just want to make sure I got yours out of the way so I will know what I'm looking at. That way I can tell him that you are just going to go ahead and max out with your own. You can max yours out…

[Phone Aff. ¶ 25]. Officer Noe averred that based on his training and experience, he understood that this conversation reflected that UM168 and Daniels were discussing that the supply source had increased the price per drug unit by $3,000 and that Daniels was now charging customers $45,000 per unit to cover the increase. [*Id.* ¶ 25a]. According to Officer Noe, Daniels was assuring UM168 that Daniels could supply him right away and that they could split the cost if UM168 did not have enough money. [*Id.*].

The next day, July 14, 2020, UM168 and Daniels had a conversation about what Officer Noe believed was drug proceeds. Specifically, UM168 said, "I wanted to make sure of something, I was looking at the weight," and "one looked like a 10.

It was all 20's that you put in two rubber bands." [Phone Aff. ¶¶ 26, 26a]. Daniels later responded, ". . . You stacked them like they were twos. It was $10,000 movements, but this last one that made 21 was supposed to make two 10s was a 5 . . . ." [*Id.*]. UM168 responded, "I counted wrong." [*Id.* ¶ 26a.]. Officer Noe averred that based on his training and experience as a drug investigator, he believed that UM168 and Daniels were discussing drug proceeds, specifically that the amount of money Daniels had received was short by $5,000 because UM168 counted it wrong. [*Id.*].

### *July 26–27, 2020*

On July 26, 2020, the day before McCrary was stopped, searched, and arrested, law enforcement intercepted a call between Daniels and UM168 in which Daniels stated that he had only "two" this time and he needed "two tomorrow." [Doc. 371-6 (Gov. Ex. 5)]. Officer Noe testified that based on his training and experience, he believed that UM168 and Daniels were planning to do a drug deal for two kilograms of cocaine the next day. [Tr. at 30, 32].

On July 27th, agents intercepted a wire conversation during which Daniels and UM168 agreed to meet at "the spot" for what agents determined would likely be the drug transaction that was discussed the previous day. [Tr. at 33–34; Doc. 371-7 (Gov. Ex. 6)]. Based on the investigation, the agents knew that "the spot" referred

to an apartment at 555 Whitehall Street in Atlanta, where law enforcement believed Daniels routinely spent the night and where he prepared drugs for distribution, distributed drugs, collected proceeds, and met conspirators.  [Tr. at 34; Whitehall St. Aff.  ¶¶ 25, 28–37].   According to Officer Noe, intercepted communications, surveillance, and geo-location data showed that Daniels had distributed drugs from the Whitehall Street location on at least three dates in 2020 before the date of the stop and search of the Cadillac.  [Whitehall St. Aff. ¶¶ 28–37, 50–52].

At the time the agents intercepted these messages about meeting at "the spot," they were preparing to execute five search warrants, including a warrant for an apartment at the Creekside Corners apartment complex (where UM168 was observed meeting with Daniels in his Cadillac in May 2020 following communications about a drug transaction) and an apartment at 555 Whitehall Street (where the drug deal with UM168 was scheduled to take place on July 27th).  [Tr. at 37, 69; Whitehall St. Aff. ¶¶ 1a, 1c].  The agents established surveillance at the Whitehall Street location.

At some point later, Officer Noe called Detective Viar, who had previously been involved in the investigation into the beige Cadillac, and told him that the driver of the Cadillac was coming to Atlanta to pick up two kilos of cocaine and that agents

expected him to travel back through DeKalb County toward Henry County after the deal was concluded.  [Tr. at 34–35].

While surveilling 555 Whitehall Street, agents observed the arrival of the same beige Cadillac that they had seen at Creekside Corner on May 25, 2020. [Whitehall St. Aff. ¶ 28].  Officer Noe sent Detective Viar a text message, advising that "He is still here on Whitehall."  [Tr. at 36–37; Doc. 371-9 (Gov. Ex. 8)].  Officer Noe also provided a description of the Cadillac and the license plate.  [Doc. 371-9]. Detective Viar responded, "Let me know when he is leaving."  [*Id.*].  Shortly after arriving, the Cadillac left.  [Whitehall St. Aff. ¶ 28].

Detective Viar then advised his partner, Detective Tillman, of the situation, informing him that the driver of the Cadillac was the subject of a DEA investigation. Detective Viar also relayed Officer Noe's updates to Detective Tillman in real time using a two-way radio communication.[5]  [Tr. at 88, 89, 148].  The detectives then positioned themselves off I-20 and waited.

---

[5] Although Detectives Viar and Tillman are partners and work in tandem, they use separate patrol vehicles because they are both K-9 officers and their dogs need to travel separately.  [Tr. at 57, 79, 90, 118, 160].

**B.** **The July 27, 2020 traffic stop and search of McCrary's Vehicle**

After the Cadillac left 555 Whitehall Street, Officer Noe and several agents followed the Cadillac onto I-20. [Tr. at 44]. Officer Noe followed the beige Cadillac the entire time on I-20 and maintained communication with Detective Viar, providing him real-time updates on the Cadillac's location. [Tr. at 43, 44]. Officer Noe followed the Cadillac until it exited onto Wesley Chapel Road, where Detectives Viar and Tillman were waiting. [*Id.* at 57]. During this time, Officer Noe was in touch with Detective Viar, who then communicated to Detective Tillman. In terms of his understanding of the situation, Detective Tillman testified that he "didn't know the whole gist of everything," but he was aware, through his partner, that the Cadillac was the subject of a DEA investigation. [Tr. at 79–80, 88–89]. According to Officer Noe, the plan was for the agents to follow the Cadillac out of the downtown Atlanta area. They expected it to drive through DeKalb County, on its way to Henry County, where they believed UM168 lived. Once in DeKalb County, Detectives Viar and Tillman could develop their own probable cause to conduct a traffic stop in order to protect the federal investigation. [Tr. at 52–53].

After the Cadillac exited I-20, Detectives Viar and Tillman began following it. [Tr. at 80]. Detective Tillman testified that he was in the lead, and he "paced"

13

the Cadillac. According to Tillman, based on the speed his patrol vehicle was travelling, he determined that the Cadillac was traveling faster than the 45-mph speed limit. [*Id.*]. According to Detective Tillman, "pacing" is a common practice used by law enforcement, whereby officers follow at least one car length behind a driver to determine how fast the driver in front of them is going by using their own speedometer. [Tr. at 81]. Detective Tillman testified that he paced the Cadillac for approximately a quarter of a mile to half of a mile. [Tr. at 80]. Also, Detective Tillman explained that his patrol car's technology confirmed that the Cadillac was speeding. [Tr. at 84–87].

Detective Tillman testified that after pacing the Cadillac, he activated his lights, and the Cadillac stopped. Almost immediately, Detective Viar arrived on the scene. [Tr. at 98; Body Cam at 1:20]. Less than two minutes after stopping the Cadillac, Detective Tillman deployed his drug detection dog, Cole, who did an open-air sniff and alerted to the presence of a drug odor in the trunk. [Tr. at 100–101; Body Cam at 2:45]. During the canine sniff, McCrary was standing with Detective Viar at the rear of his vehicle. After Officer Cole alerted, Detective Tillman searched the vehicle and located several items that the Government intends to offer as evidence at trial, including drugs and a phone. McCrary was placed under arrest less

than four minutes after being stopped.  [Tr. at 105; Body Cam at 3:30; Phone Aff.
¶ 28].

## II.    DISCUSSION

Under the Fourth Amendment to the United States Constitution, every search
or seizure by a government agent must be reasonable.  *See* U.S. CONST. amend. IV.
Typically, a search or seizure must be conducted under the authority of a court-
issued warrant, supported by a finding of probable cause to believe that evidence of
a crime will be found in the targeted location.  *See Mincey v. Arizona*, 437 U.S. 385,
390 (1978).  A traffic stop constitutes a seizure for Fourth Amendment purposes.
*Brendlin v. California*, 551 U.S. 249, 255 (2007).  A traffic stop is reasonable if it is
either (1) based upon probable cause or (2) supported by reasonable suspicion in
accordance with *Terry v. Ohio*, 392 U.S. 1 (1968).  *See United States v. Harris*, 526
F.3d 1334, 1337 (11th Cir. 2008).  "[A]n officer's motive in making the traffic stop
does not invalidate what is otherwise 'objectively justifiable behavior under the
Fourth Amendment.' "  *United States v. Simmons*, 172 F.3d 775, 778 (11th Cir.1999)
(quoting *Whren v. United States*, 517 U.S. 806, 812 (1996)).

### A.    Collective Knowledge Doctrine

Before deciding whether there was probable cause (or reasonable suspicion)
to support the stop of McCrary's vehicle, I must first address the issue of whose

knowledge can be considered.  The Government argues that in analyzing whether probable cause or reasonable suspicion supported the stop, the Court should apply the collective knowledge doctrine.  This doctrine allows a reviewing court to consider knowledge of all the law officers collectively, rather than only the knowledge of the officer who conducted the stop.  It requires, however, that there be "at least a minimal level of communication" between the officer who conducted the stop and the other officers with knowledge of the facts supporting probable cause (or reasonable suspicion).  *See United States v. Andres*, 960 F.3d 1310, 1317 (11th Cir. 2020).  Thus, where, like here, the officer who makes the stop has only limited knowledge of the investigation, the Court must evaluate the level of communication between that officer and those who were aware of the facts establishing probable cause (or reasonable suspicion).  *See United States v. Khan*, No. 1:17-CR-40-SCJ, 2018 WL 2214813, at *6 (N.D. Ga. May 15, 2018).  The Government argues that the knowledge of Officer Noe may be imputed to the DeKalb County detectives based on the communications between Officer Noe and Detective Viar about the investigation that began months before the stop and occurred in real time on the day of the stop.  McCrary, on the other hand, argues that there was insufficient communication between Detective Tillman and the federal agents to allow for application of the collective knowledge doctrine.  [Doc. 386 at 3–4].

16

The evidence presented at the hearing showed that Officer Noe had been communicating with Detective Viar about the investigation since May 2020, two months before the stop.  [Tr. at 24].  At that time, Officer Noe requested Detective Viar's assistance with determining the identity of the Cadillac's driver, and obtaining information about the Creekside Corner apartment where Daniels was observed meeting with UM168 during a suspected drug deal in May 2020.  [Tr. at 21–24].  Officer Noe testified that over the next couple of months he had a few conversations with Detective Viar about the investigation.  [Tr. at 35].

According to Officer Noe, on the day of the stop, he was in communication with Detective Viar, and told him that agents believed that the Cadillac's driver was going to be picking up two kilos of cocaine.  [Tr. at 35, 50, 51].  The Government offered into evidence a text message on the date of the stop in which Officer Noe advised Detective Viar that DEA agents were at 555 Whitehall Street and provided Detective Viar with the description and license plate number of the vehicle that they believed had just engaged in a drug transaction.  [Tr. at 35, 37; Doc. 371-9 (Gov. Ex. 8)].  Officer Noe testified that after the Cadillac left the Whitehall Street location, he then called Detective Viar to give live updates about the Cadillac's location.  [Tr. at 34–35].  Both Detectives Tillman and Viar—who were partners and traveled together in separate cars—confirmed that they knew the Cadillac's driver was being

17

investigated for drug involvement.  [Tr. at 88, 152].  Detectives Viar and Tillman also confirmed that they were using two-way communication to share the updates before the stop.  [Tr. at 89].  Officer Noe testified that he understood that Detective Viar would be working with his partner, Detective Tillman.  [Tr. at 57–58].

In my view, these communications between Officer Noe and the detectives amount to at least the "minimal level of communication" necessary to allow the court to apply the collective knowledge doctrine.  *Andres*, 960 F.3d at 1317; *United States v. Guzman*, No. 1:17-CR-405-TWT-LTW-2, 2018 WL 7361073, at *5 (N.D. Ga. Dec. 13, 2018) (finding sufficient communication where the DEA coordinated with GSP prior to the operation, communicated with the GSP during the operation, and directed the GSP to stop the vehicle), *adopted by* 2019 WL 718371 (N.D. Ga. Feb. 20, 2019); *Khan*, 2018 WL 2214813, at *7 (finding sufficient communications where DEA contacted the trooper prior to the stop, the trooper was on standby on the date in question, the trooper had a DEA radio in his car, the DEA was communicating with the trooper by radio on the day of the stop, and the trooper knew what was happening via updates over the DEA radio); *United States v. Agarwal*, No. 1:17-CR-43-TCB-RGV, 2018 WL 3061923, at *10 (N.D. Ga. Apr. 6, 2018) (finding sufficient communication to apply the collective knowledge doctrine where the DEA contacted GSP for assistance, the trooper attended the DEA briefing on the morning of the

scheduled buy, and the trooper was in communication with the DEA by phone or radio throughout the day to learn the description and movement of the vehicle as well as the timing and location of the transaction), *adopted by* 2018 WL 2181620 (N.D. Ga. May 11, 2018); *United States v. Morris*, No. 1:19-CR-389-LMM-CCB, 2020 WL 7497333, at *1 (N.D. Ga. Nov. 10, 2020) (finding sufficient communication where the DEA made arrangements to have sheriff's deputies in the area to assist with a traffic stop, the DEA "generally informed" a sergeant about the drug investigation and that it involved a large quantity of methamphetamine, and the sergeant then relayed the information to a deputy who conducted the stop), *adopted by* 2020 WL 7495610 (N.D. Ga. Dec. 21, 2020); *United States v. Hernandez*, 17 F. Supp. 3d 1255, 1260 (N.D. Ga. 2014) (collective knowledge doctrine applied where the officers "with knowledge of the investigation" directed another officer, who testified at the hearing that he was aware of the federal investigation, to make the traffic stop).

The fact that Detective Tillman, who conducted the stop, had less knowledge of the investigation than his partner, Detective Viar, does not bar application of the collective knowledge doctrine. Detective Tillman had at least basic information about the operation and his role in it, and his partner provided him with information and updates from the DEA on a two-way radio. [Tr. at 79, 88, 89, 148]. These

various levels of communication entitled Detective Tillman to act on the information he received from his partner and the strength of the radio communication directing him to stop the vehicle.  *See Hernandez*, 17 F. Supp. 3d at 1259–61 (applying the collective knowledge doctrine where the officer who stopped the vehicle knew only that his department had been asked to assist federal investigators, but his partner who traveled in a separate vehicle had been in communication with the federal agents and had some knowledge of the investigation).

As such, when evaluating whether there was probable cause or reasonable suspicion to support Detective Tillman's stop of the Cadillac, I will include all facts collectively known by law enforcement at that time, pursuant to the collective knowledge doctrine.

**B.    Automobile Exception (Probable Cause to Stop and Search)**

The Government argues that the automobile exception to the Fourth Amendment's warrant requirement applies because there was probable cause to believe that there was contraband or evidence of a crime in the Cadillac when the stop occurred.  [Doc. 384 at 20–21].  The automobile exception provides that a vehicle may be stopped and searched if (1) the vehicle is readily mobile and (2) probable cause exists to believe the vehicle contains contraband or evidence of a

crime. *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996); *United States v. Delva*, 922 F.3d 1228, 1243 (11th Cir. 2019).

Here, the first prong of the test, vehicle mobility, is easily met because the Cadillac was being driven at the time it was stopped.

Probable cause exists if an arrest is objectively reasonable in view of the totality of the circumstances. *Wood v. Kesler*, 323 F.3d 872, 878 (11th Cir. 2003). The Eleventh Circuit has explained that "[p]robable cause to arrest exists if the facts and circumstances within the officer's knowledge, of which he has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed or is committing an offense." *Ortega v. Christian*, 85 F.3d 1521, 1525 (11th Cir. 1996). When a stop is conducted pursuant to the automobile exception and supported by probable cause, law enforcement is also permitted to search the vehicle. *United States v. Baldwin*, 774 F.3d 711, 720 (11th Cir. 2014). McCrary argues that the facts do not support probable cause. [Doc. 367 at 14–18; Doc. 386 at 1–5].

By the time McCrary was stopped and arrested on July 27, 2020, law enforcement had identified a specific apartment at the Creekside Corners complex that was connected to Daniels, and they had gathered facts sufficient to establish probable cause to search that location. [Whitehall St. Aff. ¶¶ 1(c), 53, 54

(identifying the Creekside Corners Apartment Unit 3106, as Target Location #3)]. They had also obtained probable cause to search an apartment at 555 Whitehall Street, where the Cadillac had just left. [*Id.* ¶¶ 1(a), 25 (identifying 555 Whitehall Street, SW, Unit H, as Target Location #1)]. In his affidavit in support of a search warrant for these locations, Officer Noe provided facts showing that Daniels prepared drugs, distributed drugs, collected drug proceeds, and met conspirators at both locations. [*Id.* ¶¶ 25, 53]. Thus, by the time McCrary was stopped and arrested, law enforcement had connected the dots between the Cadillac and these two locations where Daniels conducted drug-related activities—facts that further supported their belief that the Cadillac and its driver were also involved in drug-related activities.

The wiretap evidence, the surveillance evidence, and the timeline offer further support of law enforcement's decision to stop the Cadillac and search it. By monitoring the phones and surveilling the Whitehall Street location on July 27th, law enforcement was able to obtain strong evidence that UM168 and Daniels had planned a drug deal during their recorded conversation on July 26th. The fact that the Cadillac arrived, as expected at the Whitehall Street location, on the day discussed on the phone, further strengthens the likelihood that the driver of the Cadillac was UM168 and had just engaged in a drug deal with Daniels. I am also

22

persuaded by the credible testimony that law enforcement maintained constant surveillance on the Cadillac from the Whitehall Street location until it was stopped. This surveillance allowed law enforcement to make the reasonable inference that the Cadillac's driver was UM168 and that he had just engaged in a drug deal with Daniels immediately before being stopped.

This is highly incriminating, reliable evidence that shows that UM168 was actively involved in drug deals with Daniels and that McCrary was UM168.  Under the totality of the circumstances, I conclude that the information that the agents collectively possessed at the time of the stop was sufficient to establish probable cause to stop and search the Cadillac because at the time of the stop, there was a fair probability that contraband or evidence would be found in it.  *See Illinois v. Gates*, 462 U.S. 213, 238 (1983).

McCrary attempts to minimize the contacts between himself and Daniels, noting that their contact "involved a handful of phone conversations and a single observed meeting."  [Doc. 386 at 2].  While it may be true that their contact was limited, the nature of the contact is what matters here, and as discussed above, the evidence is damning.  McCrary also challenges Officer Noe's interpretation of the words used in the conversations, arguing that "boy" might actually mean "boy."  [*Id.* at 2].  But this asks the Court to second guess the officers' training and experience

with no basis for doing so. Courts are permitted to rely upon the reasonable interpretations given by experienced law enforcement officers as to the code, slang, or obtuse language used by those persons engaged in allegedly conspiratorial communications. *See United States v. Gonzalez-Renteria*, No. 1:17-CR-0292-ELR-AJB, 2021 WL 9758616, at 5* (N.D. Ga. Dec. 9, 2021); *see also United States v. Brown*, 872 F.2d 385 (11th Cir. 1989) (finding law enforcement officers with expertise in drug related jargon and code words can testify and admit opinions at trial regarding their interpretation of language used).

All things considered, I conclude that the information collectively known by law enforcement provided ample probable cause to stop and search the Cadillac. Given the totality of the circumstances, there was a "fair probability that contraband or evidence of a crime" would be found in the Cadillac at the time it was pulled over. *See Gates*, 462 U.S. at 238; *United States v. Goddard*, 312 F.3d 1360, 1363 (11th Cir. 2002). As such, no Fourth Amendment violation occurred when McCrary was stopped or when his vehicle was searched.

## C. *Terry* Stop (Reasonable Suspicion of Criminal Activity)

Alternatively, the Government argues that even if the facts known to law enforcement did not rise to the level of probable cause, the information the officers possessed was enough to justify a *Terry* stop. *See United States v. Williams*, 619

F.3d 1269, 1271 (11th Cir. 2010) (explaining that law enforcement officers may briefly stop a moving automobile to investigate a reasonable suspicion that its occupants are involved in criminal activity).  Under *Terry*, officers may stop and briefly detain a person for investigative purposes without violating the Constitution if they have reasonable suspicion supported by articulable facts that criminal activity may be afoot.  *See also United States v. Sokolow*, 490 U.S. 1, 7 (1989).  Whether reasonable suspicion of criminal activity exists to initiate a *Terry* stop is measured objectively based on the sum of all facts available at the time of a defendant's seizure.

Reasonable suspicion is a lesser standard than probable cause.  It exists "when a law enforcement officer has 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.' "  *Navarette v. California*, 572 U.S. 393, 396 (2014) (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)).  Determining whether reasonable suspicion existed in a given case depends on the totality of the circumstances.  *Id.* at 397.  More than a mere "hunch" is required to create reasonable suspicion, but the level of suspicion needed is considerably less than both the standard needed for either a preponderance of the evidence or probable cause.  *Id.*  Officers who have reasonable suspicion of criminal activity are authorized to stop a vehicle and detain the occupants for a reasonable time until

probable cause to search the vehicle is established. *Harris*, 526 F.3d at 1337. During a proper *Terry* investigation, a canine sniff can provide probable cause to search a vehicle, provided that the stop was lawful and the stop lasts no longer than necessary to complete the traffic-stop mission. *See Illinois v. Caballes*, 543 U.S. 405, 407–09 (2005).

In this case, the stop was clearly justified under the reasonable suspicion standard. Law enforcement had extensive wiretap and the surveillance evidence tying the Cadillac to the ongoing DEA investigation. Moreover, at the time of the stop, the Cadillac had been continuously surveilled from a known drug location where wiretap evidence suggested a drug deal had just occurred. As discussed above, in my view, these facts establish the higher probable cause standard needed to stop and search the car. But even if they did not, there is no doubt that they provided the detectives with an objective justification for the stop based upon the reasonable suspicion that the Cadillac's driver was engaged in criminal conduct. *United States v. Mikell*, 102 F.3d 470, 475 (11th Cir. 1996); *United States v. Williams*, 876 F.2d 1521, 1524 (11th Cir. 1989).

Moreover, the nature of the brief detention was eminently reasonable. Detective Tillman was aware that the DEA suspected that the Cadillac's driver had just engaged in a drug transaction. He promptly deployed his canine officer and

conducted an open-air search of the vehicle, while allowing McCrary to stand at the back of his vehicle.  The canine alerted less than two minutes after the stop, at which point, probable cause to search the vehicle was established.  *Caballes*, 543 U.S. at 409 (determining that the use of a well-trained, narcotics-detection dog during a lawful traffic stop is sufficiently reliable to establish probable cause to search).  It is hard to imagine a more reasonable, efficient, and minimally intrusive investigation. Considering the circumstances in this case, and in light of existing precedent, it is evident that the *Terry* stop was reasonable.  *See United States v. Gil*, 204 F.3d 1347, 1350 (11th Cir. 2000) (determining that seventy-five minutes in handcuffs in the back of a patrol car did not exceed the duration of an allowable *Terry* stop); *United States v. Hardy*, 855 F.2d 753, 761 (11th Cir. 1988) (approving a fifty-minute *Terry* stop in a drug-conspiracy case).  Because the *Terry* stop was justified at its inception and was reasonably related in scope to the circumstances that justified the interference in the first place, no Fourth Amendment violation occurred.[6]

---

[6] As noted above, the Government also argues that the stop was justified because there was probable cause to believe that McCrary was speeding.  McCrary complains that the detectives did not use a radar gun or other detection device to ascertain his speed and did not turn on their dash or body cameras until after the alleged speeding had occurred.  [Doc. 367 at 4, 11–12; Doc. 386 at 6–7].  He also argues that Detective Tillman's "pacing" testimony is not credible because there was not enough time or distance to properly pace his vehicle.  [Doc. 367 at 12–13; Doc. 386 at 5–6].  I need not address the speeding issue given my conclusions above that

## III.   CONCLUSION

For the reasons stated, I **RECOMMEND** that McCrary's motion to suppress [Doc. 269] be **DENIED**.

There are no other pending matters before me in this case.  Accordingly, McCrary's case is hereby **CERTIFIED** ready for trial.  No other pretrial motions for any other codefendants remain pending.  Accordingly, this case is ready for trial as to all remaining defendants.

This 31st day of May, 2023.

CATHERINE M. SALINAS
United States Magistrate Judge

---

the stop was proper either because (1) there was probable cause to believe that there was contraband or evidence of a crime in the vehicle; or (2) there was reasonable suspicion to believe that criminal activity was afoot.  If the district judge disagrees with these conclusions, the motion can be referred back to me, and I will promptly supplement this R&R with an analysis of the speeding issue.